UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, | |
| *Plaintiff,* | No. 21 CR 50027-1 |
| v. | Judge Lindsay C. Jenkins |
| Rahmeir Reeves, | |
| *Defendant.* | |

MEMORANDUM OPINION AND ORDER

Rahmeir Reeves is charged with production of child pornography, 18 U.S.C. § 2251(a), possession of child pornography, 18 U.S.C. § 2252A(a)(5)(B), and traveling for the purpose of sex with a minor, 18 U.S.C. § 2423(b). The charges arose out of an encounter with Freeport Police on October 12, 2019, in which police found Reeves, who was 25 years old, and a 16-year-old girl half naked in the back of a parked car. Reeves moves to suppress evidence recovered during that encounter, arguing that it was obtained in violation of his Fourth and Fifth Amendment rights. After reviewing the parties' briefs and evidence, [Dkts. 77, 81, 85][1], the Court grants Reeves' motion on Fourth Amendment grounds.

## I.    Background

The Court summarizes the facts based on the evidence in the record, including Freeport Police Department ("FPD") incident reports, pictures of the scene, body camera footage[2] from the officers involved, search warrant applications and orders, and an FPD tow report. [Dkts. 77, 81, 85.] The parties agree that an evidentiary hearing is not necessary. [Dkt. 81 at 31; dkt. 82.] A district court can make factual findings when ruling on a motion to suppress. *United States v. Black*, 2023 WL 5934911, at *1 (N.D. Ill. Sept. 12, 2023) (citing *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc)).

### A.    Fairway Drive

On October 12, 2019, Freeport Police Officer Matthew Anderson was on patrol in a marked squad car. At 1:16 am, he drove west down Fairway Drive, a short dead-end street surrounded by fields to the west, north, and south, and a medical campus

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]    Specifically, the Court has reviewed the body worn camera video footage from Officers Anderson, Fidecki, Hilby, and Shenberger. [Dkts. 77-4, 77-5, 77-6, 77-9, 77-11 and 77-12.]

to the northeast. [Dkts. 77 at 9; 77-3 (Fairway Drive Pictures); 77-4 (Officer Anderson BWC 1) at 00:00:28; 81 at 7.] The photograph below depicts the relevant section of Fairway Drive:



[Dkt. 77-3 at 3.]

Officer Anderson observed a car legally parked in the driveway apron depicted above at the end of the road on the north side. The driveway apron led into a field. Officer Anderson parked behind the car, about 15-feet away (roughly a car-length) and at an angle, effectively blocking the car in between the field and curbs. Officer Anderson's vehicle also partially obstructed egress from Fairway Drive. [Dkt. 77-5 (Sgt. Shenberger BWC) at 00:05:37–00:05:42.] He illuminated the car with his spotlight, reported the car to dispatch, and approached it, shining his flashlight into the back window on the driver side. The windows were obscured by fog. [Dkt. 77-4 at 00:00:28–00:00:48.]

Reeves and the minor, L.S., were seated in the back, on the passenger and driver sides, respectively. No one else was in the car and it was not running. As Officer Anderson approached, the back driver side door opened.[3] Officer Anderson could see that Defendant and L.S. were naked from the waist down. He asked if they had identification. L.S. did not. He asked, "Whose car is this?" Reeves stated it was his. Officer Anderson then asked, "Do you guys want to put your clothes on?" [*Id.* at 00:00:48–00:01:04.] They quickly got dressed. [*Id.* at 00:01:04–00:02:08.] Reeves indicated that his shoes were in the front seat and appeared to seek permission to get

---

[3]    The parties dispute whether Officer Anderson or L.S. opened the back door, but it's immaterial to the Court's holding. [Dkt. 77 at 9–10; Dkt. 81 at 7–8, 15.]

them from the front seat before exiting the vehicle to do so. [*Id.* at 00:02:08–00:02:11.] Officer Anderson again asked for Reeves' identification and who owned the car. Reeves gave Officer Anderson his New Jersey driver's license, explained that the car was a rental and, when asked, stated that he came from New Jersey to visit L.S., his "girlfriend." When Officer Anderson asked L.S. for her identification again, she said she didn't have it. He directed her to "come over here when you're done [getting dressed]," and relayed the information on Reeves' driver's license to dispatch. [*Id.* at 00:02:11–00:03:08.] Once L.S. exited the car, Officer Anderson asked her a series of questions about her identification, to which she stated that she had an Illinois driver's license (but not with her), gave her name, a birthdate (which would have made her 19), an age (18) that later turned out to be false, and information about her parents. Officer Anderson also relayed this to dispatch. [*Id.* at 00:03:20–00:05:20.]

Officer Anderson then asked Reeves if he was aware his license was suspended. Reeves explained that it was due to surcharges for tickets, but that he'd "taken care of it." Officer Anderson said, "They just ran you and said it was suspended . . . it still shows it is." Officer Anderson relayed the license plate to the dispatcher. He also learned through additional questioning that Reeves and L.S. met online. It was now 1:23 am. [*Id.* at 00:05:21–00:07:04.]

At 1:22 am, during the exchange above, Officer Fidecki arrived and stood with Reeves and L.S. while Officer Anderson went to his squad car to investigate further. [Dkt. 77-4 at 00:07:04–00:07:11; 77-6 (Officer Fidecki BWC 1) at 00:00:27–00:01:34.] While trying to identify L.S. in the system, Officer Anderson discovered that she gave him a false age and was actually 16 years old. Reeves was 25 years old. [Dkt. 77-4 at 00:07:11–00:10:25.] Officer Anderson returned to the group stating (to Officer Fidecki), "she can stay in there [Officer Fidecki's car], [Reeves], I want to talk to you." [*Id.* at 00:11:00–00:11:12.] Officer Anderson separated Reeves from the group and asked Reeves questions about his and L.S.'s relationship. Reeves stated that he met L.S. on Facebook 18 months ago, that L.S. was 16 and he was 25. He also stated that her parents knew of him but not that she was currently out of the house. The had the following exchange:

| | |
|---|---|
| Officer Anderson: | "Do they know that their 16-year-old daughter is having sex with a 25-year-old?" |
| Reeves: | "No." |
| Officer Anderson: | "Ok, see how that can be a problem for you?" |
| Reeves: | "Yeah, I understand that." |

Reeves also affirmed that he knew L.S.'s age when he traveled to Illinois to see her. [*Id.* at 00:11:12–00:12:30.] At 1:29 am, Officer Anderson let Reeves sit in his car for warmth while he questioned L.S. again. [*Id.* at 00:12:44–00:12:53.] When Officer Anderson confronted her about her false age, she confirmed she was 16 and corrected other incorrect statements she'd made. [*Id.* at 00:13:11–00:13:40.] He then told her to

3

get back into Officer Fidecki's car and asked for her phone. [*Id.* at 00:15:30–00:15:36.] It was now 1:30 am.

At 1:40 am, Sergeant Chris Shenberger arrived and asked Reeves to exit his vehicle. [Dkt. 77-5 at 00:00:07–00:00:32.] Sergeant Shenberger told Reeves they wanted to bring him to the police department to ask him some questions. [*Id.* at 00:00:37–00:00:55.] Officer Anderson patted Reeves down. [Dkt. 77-4 at 00:26:17–00:27:03.] Officer Shenberger searched Reeves' car with his consent and recovered his phone. [Dkt. 77-2 at 11.] At 1:48 am, the officers took Reeves and L.S. to the Freeport Police Department ("FPD").

### B.    Freeport Police Department

Reeves and L.S. arrived at FPD at 1:58 am and were placed in separate rooms. [Dkt. 77-11 (Officer Fidecki BWC 2) at 00:36:40–00:37:09.] At 2:15 am, Officer Anderson continued questioning Reeves about his relationship with L.S. Officer Anderson gave Reeves a *Miranda* warning, which Reeves indicated he understood verbally and by signing a form [77-12 (Officer Anderson BWC 2) at 00:00:00–00:01:40; Dkt. 77-2 at 15.] During the questioning, Reeves made further incriminating statements. He also provided his phone passcode when asked and signed a form allowing officers to search his phone. [Dkt. 77-12 at 00:32:35–00:36:31; Dkt. 77-2 at 10.]

L.S.'s father came to the police station and instructed L.S. to give the officers her phone passcode, which she did. [Dkt. 77-9 (Officer Hilby BWC) at [00:03:30–00:05:56.] FPD later obtained warrants for the phones and social media accounts, and the Government obtained warrants for Reeves' KeepSafe and Apple iCloud accounts. [Dkts. 77-2 at 13; 77-10.] Through these warrants, the Government discovered additional incriminating evidence.

## II.    Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …" U.S. Const. amend. IV. "A seizure under the Fourth Amendment occurs if 'a reasonable person would not feel free to disregard the police and move along.'" *United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020) (quoting *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020)). Seizures can occur with or without physical force. To establish a seizure in the absence of physical force, there must be both (1) a show of authority by the officer, and (2) submission to the assertion of authority by the person against whom it is directed. *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (citing *United States v. Mendenhall*, 446 U.S. 544 (1980); *California v. Hodari*, 499 U.S. 621 (1991)). Evidence obtained from an unreasonable search or seizure is generally suppressed. *United States v. House*, 120 F.4th 1313, 1316 (7th Cir. 2024).

A *Terry* stop—a brief detention to investigate a crime—constitutes a Fourth Amendment seizure and therefore must be reasonable. *United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015); *Terry v. Ohio*, 392 U.S. 1 (1968). Officers may conduct a *Terry* stop only when they have a "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Wilbourn*, 799 F.3d at 908–09 (internal quotation marks omitted). Reasonable suspicion is "something less than probable cause and more than a hunch." *Id.* at 909 (quoting *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005)).

### A.    Unlawful Seizure

Reeves argues that Officer Anderson unlawfully seized him and L.S. on Fairway Drive when he parked behind Reeves' car and shined his spotlight and flashlight on it. Consequently, he argues that evidence obtained because of that seizure should be suppressed. [Dkt. 77 at 10.] The parties agree that Officer Anderson lacked the requisite suspicion to detain Reeves prior to the car door opening at 1:16:50 am.[4] [Dkt. 77 at 16–17; Dkt. 81 at 19.] But they dispute when Reeves was seized. The threshold question, then, is whether Officer Anderson seized Reeves before the car door opened. If so, the seizure was unlawful because he lacked reasonable suspicion.

Officer Reeves did not use physical force to seize Reeves. A seizure only occurred, then, if Officer Anderson made a show of authority that Reeves submitted to. *Griffin*, 652 F.3d at 798. A "show of authority" is made when an officer's words and actions would lead a "reasonable person to believe he was not free to leave." *Mendenhall*, 446 U.S. at 554–55. This is an objective test based on the totality of the circumstances. *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015). Common factors indicating that a reasonable person would feel constrained include the threatening presence of several officers; a display of weapons or physical force; verbal and tonal indications that a person is not free to go; and being moved to another area. *United States v. Holly*, 940 F.3d 995, 1000 (7th Cir. 2019). Courts also consider whether police suggested the defendant was suspected of a crime or told he was free to go. *Id.* These factors are neither exhaustive nor exclusive. If a reasonable person

---

[4]    The parties dispute when reasonable suspicion developed *after* the moment the car door opened. [Dkt. 77 at 21; Dkt. 81 at 19–20.] The Government argues that as soon as the back door opened and Officer Anderson saw that Reeves and L.S. were naked from the waist down, there was reasonable suspicion to investigate public indecency, and while investigating that crime, Anderson developed reasonable suspicion of additional crimes, including whether Reeves had been driving on a suspended license, whether L.S. had violated curfew or obstructed by lying, or whether Reeves was contributing to the delinquency of a minor or was engaging in illegal sexual conduct with a minor. [Dkt. 81 at 20.] Since the Court finds that seizure occurred prior to the car door opening, it need not pinpoint precisely when reasonable suspicion developed after this moment, as the seizure was unlawful.

would have felt free to leave, the police encounter is considered consensual and does not implicate the Fourth Amendment. *Id.*

Reeves argues that Officer Anderson made a show of authority at 1:16 am when he effectively blocked Reeves' car in with his own and shined his spotlight and flashlight on the car. [Dkt. 77 at 12.] The Government maintains that Officer Anderson made no show of authority and that the entire encounter was consensual until Sergeant Shenberger arrested Reeves. [Dkt. 81 at 13–14.]

The mere presence of a police vehicle, even with a spotlight light on, is generally not a show of authority unless accompanied by some other assertive act. *See, e.g.*, *United States v. Clements*, 522 F.3d 790 (7th Cir. 2008) (parking 15 feet behind car with emergency lights and spotlight on not a show of authority where driver was not prevented from driving away); *United States v. Douglass*, 467 F.3d 621 (7th Cir. 2006) (parking 15 to 20 feet in front of car not a show of authority). Relevant here, the Seventh Circuit has repeatedly held that use of a police vehicle to *block* a suspect's path or restrict their movement is a show of authority. *See, e.g.*, *United States v. Johnson*, 874 F.3d 571, 572, 574 (7th Cir. 2017) (two squad cars pulled up parallel to and behind car and "bathed the parked car in bright light"); *United States v. Green*, 111 F.3d 515, 520 n.1 (7th Cir. 1997) (officers pulled in behind defendant, "blocking the car's exit"). Contrary to the Government's argument, no other assertive act, such as knocking on the car, making verbal commands, or opening the door, is necessary. [Dkt. 81 at 15.]

This case falls squarely within this line of precedent. The parties agree that Officer Anderson parked 15–20 feet behind Reeves at an angle. [Dkts. 81 at 7; 85 at 15 n.4.] Reeves argues that Officer Anderson cornered Reeves' car between the squad car, two curbs, and a roadless field, preventing him from leaving. While the Government stresses the distance between Officer Anderson and Reeves' cars, distance alone isn't enough to determine whether Officer Anderson blocked Reeves' car—positioning matters. *Compare Douglass*, 467 F.3d (parking 15–20 feet in front of car not a show of authority where defendant could easily drive away) *with United States v. Pavelski*, 789 F.2d 485, 488–49 (7th Cir. 1986) (defendant with officers parked behind and alongside him not seized until a third officer parked 20–30 feet in front of him). Ultimately the Government doesn't dispute that the position of Officer Anderson's car prevented Reeves from leaving, even though Reeves preemptively raised this argument in his opening brief. [Dkt. 77 at 12–15.] Given that neither party requested an evidentiary hearing, the Government has not rebutted Reeves' assertion that Officer Anderson effectively blocked Reeves' car, making a show of authority. The Court's own review of the video evidence, which depicts the scene from multiple perspectives, supports Reeves' position. [*See, e.g.*, Dkts. 77-4 at 00:00:32; 77-5 at 00:00:04, 00:05:42.] Although there is about a car-length gap between the cars, the squad car is close enough that Reeves, boxed in by the curbs on the right and left and a field in front, would have to maneuver around Officer Anderson's car to back out of

6

the driveway apron and leave. *See Smith*, 794 F.3d at 686 (An officer "need not totally restrict a citizen's freedom of movement" to seize them if their positioning sufficiently communicates that a person is not free to leave).

Other factors also indicate a show of authority. After parking, Officer Anderson bathed Reeves' car in light from his spotlight and flashlight, further signaling his focus on the occupants of the car. While use of illuminating lights on a parked car is certainly justified by safety concerns, *see Clements*, 522 F.3d at 794–95, a reasonable person in Reeves's position would not feel that he was free to leave under the circumstances. In addition, the encounter occurred at night, on a dead-end street, with no one else around. *See Smith*, 794 F.3d at 685 (distinguishing dark, narrow, unpopulated alleys from other public areas that cut against seizure). It "seems unlikely that a reasonable person placed in a spotlight and knowing that he was the focus of police attention would believe that he was free to maneuver his car out of the parking space." *United States v. Packer*, 15 F.3d 654, 657 n.3 (7th Cir. 1994) (seizure occurred where officers parked behind and in front of a car already parked next to a curb, shined "take down lights" through windows, and approached with flashlights but without a weapon drawn). Given the circumstances, Officer Anderson acted in a manner that would lead a reasonable person to believe that he could not leave.

The Government argues that this case is more akin to a consensual encounter where "the degree of suspicion that is required is zero." *United States v. Pace*, 48 F.4th 741, 748 (7th Cir. 2022) (cleaned up). The ultimate question is whether the encounter "involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning." *United States v. Cade*, 93 F.4th 1056, 1060 (7th Cir. 2024) (quoting *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015)). The Government likens this case to *Cade*, where officers stopped in front of a parked car, turned on their emergency lights, and exited the vehicle to question pedestrians standing near the car. *Id.* at 1058–59. In finding the encounter consensual, the Court found it relevant that the "interaction took place on a public road with other cars and people nearby, only two officers were present (matching the number of suspects), and the officers' conduct was not threatening," and they did not "show their weapons," speak in an "aggressive tone," or "imply that anyone was suspected of a crime." *Id.* at 1060 (citing *Holly*, 940 F.3d at 1000).

Some similar factors here indicate a consensual encounter: there was initially only one officer, he didn't show his weapon, speak aggressively, or act in a threatening manner. But other factors make *Cade* inapposite. *Cade* relied heavily on the fact that the defendant was standing outside his car the whole time. *Id.* at 1061 (blocking a car "can contribute to non-consensual stops of parked cars, even where occupants have exited their cars . . . In this case, however, [defendant] had been outside the car all along . . ."). Here, Reeves was in the backseat of the car when Officer Anderson arrived. And while the officers in *Cade* blocked the defendant's car, they "were necessarily going to block in at least one or two cars no matter where they stopped,"

*id.* at 1061, whereas here, Officer Anderson deliberately parked behind Reeves instead of anywhere else on an otherwise empty street. This made it clear that he was constraining Reeves' movement. *Cf. United States v. Johnson*, 856 F. App'x 48, 48–49, 51 (7th Cir. 2021) (stopping next to a car not a show of authority where there were no other parking options). The encounter in *Cade* also occurred on a public street with other cars and people nearby. *Cade*, 93 F.4th at 1060. Reeves' encounter occurred on a dead-end street at night, with no one around. Although technically public, it was no question that Officer Anderson was focused on Reeves' car. *See Smith*, 794 F.3d at 685.

The Government also cites *United States v. Pace*, another consensual encounter case. 48 F.4th 741 (7th Cir. 2022). There, an officer parked behind the defendant and turned on his emergency lights shortly after the defendant had voluntarily exited his car to approach the officer to ask a question. *Id.* at 745. The Court found the encounter consensual because it "took place outside; [the officer] did not force [defendant] to stop as his vehicle was already parked; only one officer was present; there was no threatening presence or show of authority; and [defendant] moved about freely during their initial interaction." *Id.* at 748. The officer also first asked the defendant whether he needed help. *Id.*

Reeves' encounter differs from *Pace* in essential ways. Most importantly, unlike *Pace*, Reeves' car was boxed in. *Id.* at 745 ("The exit to the parking lot was in front of [defendant's] car; nothing obstructed his ability to drive away."). And while Officer Anderson didn't speak aggressively, the questions he initially asked cannot be characterized as "an officer seeking the citizen's voluntary cooperation through non-coercive questioning." *Cade*, 93 F.4th at 1060. When Reeves' door opened, Officer Anderson said "hello," and asked, "Do you have your IDs with you?," (L.S. responded "No.") "Whose car is this?," (Reeves indicated it was his) and "Do you want to get your clothes on?" [Dkt. 77-4 at 00:00:48–00:01:04.] The BWC reveals that his tone was calm but also made clear that he was directing—not asking—Reeves and L.S. to produce identification and get dressed. This became more obvious when Reeves, while getting dressed in the back of the car, appeared to ask permission to get his shoes from the front seat before getting out. [Dkt. 77-4 at 00:02:03–00:02:09 (Reeves: "My shoes are up there." Officer Anderson: "That's fine. Yep, come on.")] Officer Anderson also repeatedly asked for their identification and who owned the car after they got dressed. [*Id.* at 00:02:09–00:02:20, 00:02:30–00:02:33, 00:02:53, 00:05:11.] Unlike *Pace*, he never inquired whether they needed help.

The Government's remaining non-seizure cases are readily distinguishable because the officers in those cases didn't purposely block the defendant's path or constrain their movement, even if they parked nearby. [Dkt. 81 at 15–16.] In *Clements*, officers parked fifteen to twenty feet behind Clements' already parked car and activated their emergency lights and a spotlight, but nothing prevented Clements from driving away. 522 F.3d at 797–795. *Douglass* also involved a police car that was

parked twenty feet away but not so as to block the defendant's car. 467 F.3d at 624. *Hendricks* involved a police car that stopped behind the defendant's vehicle with nothing to prevent its exit from the gas station, and one of the occupants stepped out of the vehicle to engage the officer in conversation. *United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003). Finally in *Johnson*, officers in an unmarked squad car stopped next to Johnson's vehicle, which was parked behind another car and next to the curb in front of a fire hydrant. 856 F. App'x at 48–49. Although it was "not easy" for Johnson to leave, the officers parked next to Johnson's car because it was the only place they could naturally voice their concern about the blocked fire hydrant. In that circumstance, "a reasonable person . . . would not perceive that the police stopped their car in order to block him and compel answers." *Id*. at 51 (distinguishing *Johnson* from *Green*, 111 F.3d at 521). And no other factors indicated that Johnson couldn't terminate the encounter. Unlike here, the officers there arrived "in plain clothes, in a single unmarked car, without activating sirens or lights…" *Id*. at 50.

Finally, the Government claims that Officer Anderson's actions fall within the "community caretaking" exception to the Fourth Amendment. [Dkt. 81 at 15.] This narrow doctrine holds that some police functions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" don't fall under the Fourth Amendment. *Cady v. Dombrowksi*, 413 U.S. 433, 441 (1973). But the Government fails to explain how Reeves' actions qualify as community caretaking or cite a single case in support, even though Reeves anticipated this argument.[5] [Dkt. 77 at 23–25.] Nor does the Court see how it would apply. The community caretaking exception was originally created to allow police to impound and search a disabled or damaged vehicle to protect the public and any property in an impounded vehicle while it was temporarily seized. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553–56 (7th Cir. 2014) (discussing *Cady*, 413 U.S.; *South Dakota v. Opperman*, 428 U.S. 364 (1976)). Today, it also allows police to check on sleeping or incapacitated people in vehicles in public places. *Long v. United States*, 847 F.3d 916, 920–21 (7th Cir. 2017); *Woods v. Vill. of Bellwood*, 502 F. Supp. 3d 1297, 1307–08 (N.D. Ill. 2020). This case doesn't reflect either scenario. Reeves' car hadn't been impounded, was not an obstruction, visibly damaged, or otherwise a threat, nor did the circumstances involve anyone sleeping behind the wheel, incapacitated or in need of help. Consequently, Officer Anderson's actions constituted a show of authority, not community caretaking.

---

[5]     The Government seems to rely on *Lickers* for its theory of community caretaking, stating, "Officer [Anderson's] decision to approach defendant's parked car was akin to community caretaking, or the 'product of the officer's curiosity in response to what seemed like odd behavior.'" [Dkt. 81 at 15 (quoting *United States v. Lickers*, 928 F.3d 609, 615–16 (7th Cir. 2019)).] But *Lickers* is not a community caretaking case. It involved a consensual encounter in which plain-clothes officers approached and questioned someone in a parked car who was behaving oddly. There were none of the indicia of authority that are present here. And an officer's subjective curiosity does not displace the need for reasonable suspicion to effect a lawful *Terry* stop.

Next, the Court must determine when Reeves submitted to Officer Anderson's show of authority to identify the moment of seizure. *Griffin*, 652 F.3d at 798 ("[A]n officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority.") The Government doesn't address Reeves' submission argument. [Dkt. 81 at 18 (reiterating that there was no show of authority).] Reeves argues that he immediately submitted because he didn't exit the car until Officer Anderson directed him to get dressed. It is well-established that someone sitting in a car can submit by remaining seated. *Brendlin v. California*, 551 U.S. 249, 262 (2007). The seizure therefore occurred at 1:16 am when Officer Anderson blocked and shined his lights on Reeves' car and Reeves stayed seated. Because the parties agree that Officer Anderson didn't have reasonable suspicion before this moment, the seizure was unlawful.

## B. Fruit of the Poisonous Tree

Reeves argues that evidence obtained from his unlawful seizure must be suppressed. The exclusionary rule bars in criminal trials the introduction of evidence obtained in violation of the Fourth Amendment. *Utah v. Strieff*, 579 U.S. 232, 237 (2016). This includes evidence obtained "as a direct result" of the illegal seizure and "evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *Id.* (internal quotation marks omitted); *United States v. Street*, 917 F.3d 586, 593 (7th Cir. 2019). The exclusionary rule only applies "where its deterrence benefits outweigh its substantial social costs," and several exceptions have accordingly been recognized, including the attenuation, independent source, and inevitable discovery doctrines. *Strieff*, 579 U.S. at 237–38 (cleaned up). The Government bears the burden of proving that an exception applies. *United States v. Ienco*, 182 F.3d 517, 528 (7th Cir. 1999); *United States v. Conrad*, 673 F.3d 728, 732–33 (7th Cir. 2012) (government bears the burden of "identifying the point at which the government began obtaining evidence 'by means sufficiently distinguishable to be purged of the primary taint.'") (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975)).

First, Reeves argues that police observations and BWC footage obtained from the scene, and testimony and evidence related to them, should be suppressed as the immediate fruits of an illegal seizure. [Dkt. 77 at 25.] Given that this evidence was obtained directly after and wholly due to an unlawful seizure, and that the Government raises no argument against it, the Court holds that the BWC footage from the Fairway Drive encounter and police observations thereof are suppressed.

Second, Reeves argues that the illegal seizure tainted evidence obtained later, including (1) Reeves' statements, (2) Reeves and L.S.'s phones and evidence recovered from them pursuant to search warrants, and (3) L.S.'s statements and testimony. The Court takes each in turn.

The Government argues that attenuation purged Reeves' incriminating statements made at the station of taint from the illegal seizure.[6] [Dkt. 81 at 26–28.] Attenuation is an exception to the fruit of the poisonous tree doctrine that admits evidence when the "connection between the illegal conduct and the subsequent discovery of evidence becomes so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Conrad*, 673 F.3d at 732 (cleaned up). As set out in *Brown*, three factors determine whether attenuation has occurred: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.*; *Brown*, 422 U.S. at 603–04.

Despite bearing this burden, *Conrad*, 673 F.3d at 732–33, the Government only fulsomely addresses one of three *Brown* factors: temporal proximity. It argues that because Reeves made his station statement almost an hour after Freeport officers "had probable cause" to arrest him for driving on a suspended license, the statement was attenuated from the seizure. [Dkt. 81 at 27–28.] Even accepting that an hour can be sufficient to support attenuation, *United States v. Davis*, 44 F.4th 685, 689 (7th Cir. 2022) (forty-five minutes enough for attenuation), and even assuming the suspended license could provide probable cause, temporal proximity "is not itself dispositive and must be considered along with any intervening circumstances." *Ienco*, 182 F.3d at 527; *see, e.g.*, *id.* at 526–27 (four hours insufficient without intervening circumstance); *Green*, 111 F.3d at 521 (five minutes sufficient where discovery of separate warrant was an intervening circumstance).

The Government hints at one potential intervening circumstance, stating that "defendant's arrest was not unlawful, and thus his post-arrest recorded statements should not be suppressed." [Dkt. 81 at 28.] If the Government means to suggest (as the Court reads it) that the probable cause justifying Reeves' arrest during the encounter attenuated his post-*Miranda* statement from the unlawful seizure, then its argument is unavailing. Probable cause may be an intervening circumstance when it preexists or is developed during an illegal encounter, but only if it's unrelated to the Fourth Amendment violation. For example, discovery of an independent search warrant is an intervening circumstance when the information supporting the warrant is "wholly unconnected" to the violation. *Segura v. United States*, 468 U.S. 796, 814 (1984). This is so because the warrant could be executed without an unlawful search or seizure. A preexisting arrest warrant is an intervening circumstance for the same reason. As explained by *Strieff*, an arrest pursuant to a warrant, even after an illegal search or seizure, is "independently compelled by the pre-existing warrant." 579 U.S. at 240–41. Once an officer is authorized to arrest someone pursuant to a warrant, they may also search that person to protect their safety. *Id.*; *cf. Taylor v.*

---

[6]     The Government does not argue that any exception to the fruit of the poisonous tree doctrine applies to Reeves' incriminating statements made *at* the scene. Therefore, it has not met its burden of showing that those statements were not tainted, and they will be suppressed. *Ienco*, 182 F.3d at 528.

11

*Alabama*, 457 U.S. 687, 692–93 (1982) (arrest warrant filed after unlawful arrest not intervening circumstance where it was based on evidence obtained from the arrest).

In a similar vein, probable cause developed contemporaneously with an illegal seizure, but independent of it, can be an intervening circumstance. In *McDaniel v. Polley*, law enforcement identified the defendant in a photo-array lineup while other officers separately executed an illegal arrest. The officers only learned about the identification while transporting the defendant to the police station. 847 F.3d 887, 894–95 (7th Cir. 2017). The Seventh Circuit held that the probable cause created by the identification was an intervening circumstance because it was wholly unconnected to the illegal arrest. *Id.* at 895 ("Had the officers not put [defendant] in handcuffs briefly and waited minutes to put him in the police car, they would have had probable cause for the arrest.")

The through-line in these cases is that probable cause to search or arrest the defendant preexisted any Fourth Amendment violation or was developed independently. Or the only information obtained during the encounter needed to act on the probable cause was the defendant's identity, which is not suppressible. *United States v. Chagoya-Morales*, 859 F.3d 411, 418 (7th Cir. 2017) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039–40 (1984))).

This case is different. During the encounter, Freeport officers developed probable cause to believe Reeves (1) was driving on a suspended license and (2) traveled for the purpose of sex with a minor. Reeves was only arrested and charged for the latter. Regardless, neither basis for probable cause preexisted the encounter or was developed apart from it, and neither basis relied solely on Reeves' identity to effectuate a lawful arrest. To the contrary, information essential to creating probable cause came directly from the unlawful seizure. While Reeves' license was marked as suspended before the encounter, Officer Anderson had to investigate to determine if *Reeves* was *driving* on it because Reeves was sitting in the back passenger seat of the car when Officer Anderson first approached him. *See* 625 ILCS 5/6-303(a).[7] Nor was Reeves the only person in the car who could have been driving. Officer Anderson also lacked probable cause to arrest Reeves for traveling for the purpose of sex with a minor (or any other crime related to illegal sexual conduct with a minor) until he identified L.S. Probable cause was thus developed during and because of the illegal

---

[7]     Illinois law makes it a class A misdemeanor for any person to "drive or [be] in actual physical control of a motor vehicle" with a driver's license that is revoked or suspended under Illinois law or under the law of any other state. 625 ILCS 5/6-303(a). The elements necessary to prove this offense are "(1) the act of driving a motor vehicle on the highways of this State, and (2) the fact of the revocation of the driver's license or privilege." *People v. Jackson*, 983 N.E.2d 1027, 1033 (Ill. 2013).

encounter and relied on more than just Reeves' identity. The Court has found no case law stating that probable cause developed during an illegal seizure, from the fruits of that seizure (excluding the defendant's identity) breaks the causal chain. Therefore, the Government has not identified an intervening circumstance, which is "central" to attenuation analysis. *Ienco*, 182 F.3d at 527. Nor does the Government address the purpose and flagrancy prong, although this element "of no moment" anyway without an intervening circumstance. *Id.* at 528.[8] The Government didn't argue that any other exception purges Reeves' statements of taint, so his statements at the scene and later at the station will be suppressed.

Regarding Reeves and L.S.'s phones and evidence obtained from them via search warrants, the Government invokes the inevitable discovery doctrine. This exception applies if the Government can show by a preponderance of the evidence that it would have uncovered the challenged evidence through lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984).[9] The Government must demonstrate "(1) that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence, and (2) that it would have conducted a lawful search absent the challenged conduct." *United States v. Eymann*, 962 F.3d 273, 288 (7th Cir. 2020) (internal quotation marks omitted).

The Government fails this test. Its argument on this point is one sentence: that once Freeport Police had Reeves' license and L.S.'s name, they would have inevitably learned that L.S. was underage, contacted her parents, and applied for search warrants for their phones. [Dkt. 81 at 30.] But this argument ignores the original sin: the unlawful seizure. The Government needed to show that evidence informing the search warrants would have been discovered using *lawful* means. *See, e.g.*, *Gentry v. Sevier*, 597 F.3d 838, 850 (7th Cir. 2010) (no inevitable discovery where officers would not have discovered incriminating evidence but for illegal seizure and search). Here, the seizure was accomplished *unlawfully*, and the Government doesn't argue that the officers "would have discovered [the] fruits" of that seizure, which informed the search warrant applications, "had they obeyed the law." *United States v. Langford*, 314 F.3d 892, 895 (7th Cir. 2001); *see also United States v. Johnson*, 380 F.3d 1013, 1016–17 (7th Cir. 2004) (no harmful illegality only if the evidence "would indeed have been obtained *lawfully*"); *see, e.g.*, *United States v. Jones*, 708 F. Supp. 3d 1365, 1376 (N.D. Ill. 2023) (inevitable discovery inapplicable where evidence was discovered through illegal seizure and search) ("Without the crucial decision to follow [defendant] to his car" based on a hunch, "there is no evidence that the officers would have

---

[8]     The Government also notes that Reeves was read his *Miranda* rights before making his statement at the station, [Dkt. 81 at 27–28], but *Brown* says that a *Miranda* warning alone doesn't cause attenuation. *Brown*, 422 U.S. at 603–04; *Conrad*, 673 F.3d at 734.

[9]     Contrary to Reeves' argument, [Dkt. 85 at 26], the Government didn't need to address *United States v. Bell*, 925 F.3d 362 (7th Cir. 2019), as *Bell* addresses the independent source doctrine, which is closely related to but different from inevitable discovery. *See United States v. Markling*, 7 F.3d 1309, 1318 n.1 (7th Cir. 1993).

independently followed [defendant's car], discovered that [his] license was suspended, and impounded the car."); *United States v. Carpenter*, 2023 WL 358794, at *7 (N.D. Ill. Jan. 23, 2023) (inevitable discovery inapplicable because government could not have relied on fruit of an illegal search to obtain a warrant); *cf. United States v. Buchanan*, 910 F.3d 1571 (7th Cir. 1990) (inevitable discovery applicable even where search warrants were based on information obtained from unlawful search because probable cause already existed to search for murder weapon and a search warrant would inevitably have been sought and issued). As Reeves persuasively argues, absent the unlawful seizure (and any argument that Officer Anderson would have legally seized or approached Reeves otherwise), Freeport Police would have no idea who Reeves and L.S. were and no reason to apply for search warrants, much less evidence to support them. [Dkt. 85 at 26–27.] Consequently, Reeves and L.S.'s phones and evidence recovered pursuant to the search warrants must be suppressed.

Finally, Reeves argues that L.S.'s statements must be suppressed. The exclusionary rule may be applied to witness statements and testimony if they are sufficiently attenuated from the constitutional violation. *United States v. Ceccolini*, 435 U.S. 268 (1978); *Ienco*, 182 F.3d at 529–30. Courts consider the following factors: "(1) whether the testimony given by the witness was an act of free will or coercion or induced by official authority as a result of the initial illegality; (2) whether the illegality was used in questioning the witness; (3) how much time passed between the illegality and contact with the witness and between the contact and the testimony; (4) whether the identity of the witness was known to the police before the illegal conduct; and (5) whether the illegality was made with the intention of finding a witness to testify against the defendant." *Ienco*, 182 F.3d at 530 (cleaned up). This resembles standard attenuation analysis but sets a higher bar excluding for live witness statements than inanimate evidence given the greater cost of losing a valuable witness who could testify voluntarily. *Ceccolini*, 435 U.S. at 276–80.

Here too, the Government hasn't borne its burden to show admissibility. It argues that there's "no need for analysis under [*Ceccolini*]" because "there was no illegality in the encounter with [L.S.]." [Dkt. 81 at 30.] But since the Court concluded that Officer Anderson did unlawfully seize Reeves, the Government apparently ceded any alternative argument under *Ceccolini*. It does remark that L.S. was "compliant" in answering Officer Anderson's questions, although she appeared "reluctant," [*id.* at 29 n.14], which goes to the first *Ceccolini* factor—whether the witness made a voluntary statement. But other facts make clear that L.S. was coerced into incriminating Reeves (by stating her true age). After Officer Anderson ran L.S.'s name and discovered that she was underage, he directed her to Officer Fidecki's car. Then, after questioning Reeves separately, he questioned L.S. as she stood between the interior and open door of the police car. He asked her to identify her mom. When L.S. said she didn't want her mom involved and was an "adult," he stated: "You've already lied to me about how old you are. Don't play these games." He then asked her age, to which she truthfully stated that she was 16. He then said: "You realize you

14

could be arrested for lying about your age and giving me the wrong birthdate?" L.S. stated that she only did so to prevent Reeves from getting into trouble. She then corrected other misstatements she'd made in response to more questions. [Dkt. 77-4 at 00:13:14–00:15:29.] Based on this interaction—namely that L.S. was curtly questioned while standing at a police car and told she could be arrested for lying— her statement was nonvolitional, dictated by her and Reeves' perceived "precarious legal situation—a circumstance forged by the illegal [seizure]." *Ienco*, 182 F.3d at 530. The first *Ceccolini* factor thus favors suppression. The Government didn't address any other factor.[10] Consequently, L.S.'s statements and testimony will be suppressed.

In summary, Officer Anderson illegally seized Reeves without reasonable suspicion in violation of his Fourth Amendment rights. On this basis, the Court suppresses the immediate and tainted fruits of the encounter, including body-cam footage, police observations, and related testimony; Reeves and L.S.'s phones and evidence recovered from them pursuant to search warrants; and Reeves and L.S.'s statements and testimony.[11]

## III. Conclusion

Reeves' motion to suppress [Dkt. 77] is granted.

Enter: 21-cr-50027-1
Date: January 10, 2025

_____
Lindsay C. Jenkins
United States District Judge

---

[10] Most of these also favor suppression: Officer Anderson first questioned L.S. shortly after the seizure and then again after he ran her information and questioned Reeves; he used the fruit of the illegal seizure (her verified birthdate) to question her; and L.S. was unknown to Freeport Police before the encounter.

[11] Having found in Reeves' favor under the Fourth Amendment, the Court does not reach the question whether his incriminating statements should also be suppressed under the Fifth Amendment.